UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MLS NATIONAL MEDICAL
EVALUATION SERVICES, INC.,

      Plaintiff,                        Case No. 10-14649
                                         Hon. Gerald E. Rosen

v.

JAMES W. TEMPLIN, M.D., and
THE LOS ANGELES DAILY JOURNAL,

      Defendants.
_____/

**OPINION AND ORDER GRANTING DEFENDANT'S
MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____ May 16, 2011 _____

PRESENT:  Honorable Gerald E. Rosen
                Chief Judge, United States District Court

## I. INTRODUCTION

On October 12, 2010, Plaintiff MLS National Medical Evaluation Services, Inc., a

Michigan corporation, commenced this suit in a Michigan state court against Defendant

James Templin, M.D., a Kentucky physician, and a California-based publication that

addresses law-related subjects, the Los Angeles Daily Journal.  In its three-count

complaint, Plaintiff has asserted claims of defamation/libel, false light invasion of

privacy, and injurious falsehood, with each of these claims arising from an October 2009

article published by the Defendant Daily Journal in which Plaintiff was accused of

altering a report of an independent medical examination performed by Defendant

Templin, and in which Dr. Templin was quoted as stating that Plaintiff forged his name

on this report.  The Defendant Daily Journal removed the case to this Court on November

22, 2010, citing the parties' diverse citizenship as the ground for removal.  *See* 28 U.S.C.

§ 1332(a)(1).[1]

By motion filed on February 3, 2011, Defendant Templin seeks the dismissal of

the claims against him for lack of personal jurisdiction.  Alternatively, Defendant

contends that the issue of personal jurisdiction — or, more accurately, the lack thereof —

should be deemed conclusively resolved against Plaintiff, in light of the Court's ruling in

an earlier suit brought by Plaintiff that personal jurisdiction over Defendant Templin was

lacking in that case.  Plaintiff filed a response in opposition to Defendant's motion on

February 25, 2011, arguing that Dr. Templin purposefully availed himself of a Michigan

forum by making false and defamatory statements about a Michigan-based company in an

article that was likely to be widely distributed, and that this Court's prior ruling on

personal jurisdiction is not entitled to issue-preclusive effect because the issues presented

here and in the earlier suit are not identical.

Having reviewed the parties' submissions in support of and opposition to

Defendant's motion, as well as the record as a whole, the Court finds that the relevant

allegations, facts, and legal arguments are adequately presented in these written materials,

---

[1]Following removal, Plaintiff filed a January 21, 2011 notice voluntarily dismissing its
claims against the Defendant Daily Journal.  Thus, Dr. Templin is the sole remaining Defendant.

2

and that oral argument would not aid the decisional process.  Accordingly, the Court will decide Defendant's motion "on the briefs."  *See* Local Rule 7.1(f)(2), U.S. District Court, Eastern District of Michigan.  This opinion sets forth the Court's rulings on this motion.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff MLS National Medical Evaluation Services, Inc. is a Michigan corporation with its principal place of business in Oakland County, Michigan.  Plaintiff arranges independent medical evaluations ("IMEs") for insurance companies, employers, and other clients.  Once a physician has performed an IME at Plaintiff's request, the physician furnishes a report of the examination to Plaintiff, either by faxing it to Plaintiff's office in Michigan or by dictating his or her findings by telephone into a recording system maintained in Plaintiff's Michigan office.  Plaintiff then transmits the physician's IME report to its client.

### A.     The Prior Suit Brought By Plaintiff Against Defendant Templin

In late 2003, Plaintiff was asked by one of its clients, Wausau Benefits, Inc., to arrange an IME of Terry Hall, a Kentucky resident who claimed he was totally disabled due to chronic back pain.  Plaintiff, in turn, contacted Defendant James W. Templin, M.D., who agreed to perform an IME of Mr. Hall at his office in Lexington, Kentucky.  Defendant Templin examined Mr. Hall on December 5, 2003, and then dictated his findings by telephone into Plaintiff's digital dictation system in Michigan.  According to Plaintiff, Defendant Templin concluded in this report that Mr. Hall was not totally disabled, but rather was capable of working within certain specified restrictions.  Plaintiff

3

forwarded this report to Wausau Benefits, and Mr. Hall's claim for disability benefits was denied.

Unbeknownst to Plaintiff, however, Dr. Templin provided Mr. Hall with a copy of his IME findings that he had dictated and prepared at his own office, and this report allegedly differed in certain respects from the report dictated into Plaintiff's digital recording system. According to the complaint, Defendant Templin was "pressured by Hall's lawyers to alter his opinion of Hall's disability status," and he "ultimately agreed to change his opinion" to conclude that Hall was disabled. (Complaint at ¶¶ 32-33.) Upon learning of this, Plaintiff asked Defendant Templin to provide a clarification of his earlier report, and the doctor responded by issuing an "addendum" in which he opined that Mr. Hall was totally disabled and unable to perform any type of work. (*Id.* at ¶¶ 34-35.)

In 2006, Mr. Hall filed suit against Plaintiff in a Kentucky state court, alleging that Wausau Benefits had denied his claim for disability benefits as a result of a report produced by Plaintiff that did not accurately convey Dr. Templin's IME findings. Plaintiff, in turn, brought suit against Defendant Templin in January of 2008 in a Michigan state court, asserting state-law claims of breach of contract, negligence, breach of fiduciary duty, tortious interference, fraud, and negligent or innocent misrepresentation. Plaintiff's suit was removed to this Court on diversity grounds, but in an opinion issued on July 9, 2008, the Court dismissed this earlier action for lack of personal jurisdiction over Defendant Templin. *See MLS National Medical Evaluation*

*Services, Inc. v. Templin,* No. 08-11653, 2008 WL 2704672 (E.D. Mich. July 9, 2008).

**B.**     **The Los Angeles Daily Journal Article Giving Rise to the Present Suit**

On October 13, 2009, the Defendant Los Angeles Daily Journal published an article entitled "Doctors Paid To Aid Insurers In Disability Claim Denials." (Plaintiff's Complaint, Ex. F.)[2] This lengthy article described the general process used by insurers to handle claims for disability benefits, quoted legal experts in this field, and discussed a number of specific cases that illustrated purported flaws in the system for processing disability claims.

In a passage subtitled "Altered Report," the Daily Journal article recounted Mr. Hall's difficulties in obtaining disability benefits for his chronic back pain. The article referenced Plaintiff by name, stating that it was "a Michigan-based firm that describes itself as a national leader in independent medical assessments." (*Id.* at 5.) The article then suggested that Plaintiff had altered Defendant Templin's report of his examination of Mr. Hall, stating that "[w]hen Dr. James Templin compared his own notes against the official copy that MLS sent to the insurance company, he did not recognize entire sentences." (*Id.*) The article further stated that while the "doctor's report prepared by MLS" indicated that Mr. Hall was capable of sedentary work, Defendant Templin "had come to the opposite conclusion about the patient," finding that there was no work he could perform. (*Id.*)

---

[2]This article evidently also appeared in a sister publication, the San Francisco Daily Journal.

The article described Defendant Templin as "so horrified" by the purported discrepancies between his IME findings and the report given by Plaintiff to the insurer that he "sent his original notes to Hall, who sued MLS for allegedly tampering with the medical report during transcription in order to deny his claim."  (*Id.*)  The article also quoted Dr. Templin as stating that "[t]hey forged my name and they admitted to it," that "[t]hey can do anything they want," and that "it is nearly fool proof because doctors always dictate straight into their system."  (*Id.* at 5-6.)  The article noted, however, that Plaintiff had denied adding new sentences to Defendant Templin's report.  (*Id.* at 5.)

Plaintiff states that it first learned of the Daily Journal article in late October of 2009, when it was in negotiations with a prospective client for a "major contract" for its "independent medical evaluation and peer review services."  (Plaintiff's Response, Ex. A, Schimizzi Aff. at ¶¶ 8-9.)  According to Plaintiff, this prospective client "abruptly cancelled all further negotiations," citing the Daily Journal article and Defendant Templin's quoted statements in the article as the reasons for discontinuing the parties' discussions.  (*Id.* at ¶ 12.)  This lawsuit followed on October 12, 2010, with Plaintiff asserting claims of defamation/libel, false light invasion of privacy, and injurious falsehood against the Daily Journal and Dr. Templin.[3]

---

[3]As noted earlier, following the removal of the case to this Court, Plaintiff voluntarily dismissed its claims against the Los Angeles Daily Journal.

# III.  ANALYSIS

## A.    The Standards Governing Defendant's Motion

Through his present motion, Defendant Templin seeks the dismissal of this action pursuant to Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction.  As the party bringing suit in a Michigan forum, Plaintiff has the burden of establishing that the Court may permissibly exercise personal jurisdiction over Defendant.  *See Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002).  Because the Court is resolving this issue solely upon the written record and without an evidentiary hearing, Plaintiff "need only make a prima facie showing of jurisdiction."  *Neogen Corp.*, 282 F.3d at 887 (internal quotation marks and citation omitted).

To make this *prima facie* showing, Plaintiff must "establish[] with reasonable particularity sufficient contacts between [Defendant Templin] and the forum state to support jurisdiction."  *Neogen Corp.,* 282 F.3d at 887 (internal quotation marks and citation omitted).  More specifically, Plaintiff must demonstrate that the Court's exercise of personal jurisdiction over Dr. Templin is "both (1) authorized by the law of the [forum state, Michigan], and (2) in accordance with the Due Process Clause of the Fourteenth Amendment."  282 F.3d at 888.  In determining whether this showing has been made, the Court does not "consider facts proffered by the defendant that conflict with those offered by the plaintiff, and will construe the facts in the light most favorable to" Plaintiff as the

7

non-moving party.  282 F.3d at 887.[4]

**B.    Plaintiff Has Failed to Make a *Prima Facie* Showing of the Court's Personal Jurisdiction over Defendant Templin.**

In diversity cases such as the present one, the Court must apply the law of the

forum state to determine whether it may exercise jurisdiction over Defendant.  *Shah v.*

*Nu-Kote Int'l, Inc.*, 898 F. Supp. 496, 500 (E.D. Mich. 1995), *aff'd*, 106 F.3d 401 (6th Cir.

1997).  The Michigan long-arm statute governing limited personal jurisdiction over

individuals, Mich. Comp. Laws § 600.705, has been interpreted as conferring upon

Michigan courts the "maximum scope of personal jurisdiction permitted by the Due

---

[4]Apart from arguing that personal jurisdiction is lacking, Defendant also contends that Plaintiff is barred by principles of collateral estoppel (or issue preclusion) from relitigating the issue of personal jurisdiction, in light of the Court's dismissal of the prior suit brought by Plaintiff against Defendant for lack of personal jurisdiction.  This appeal to issue preclusion is unavailing, however.  Because the Court sat in diversity in the earlier suit, the preclusive effect of its prior ruling must be determined by resort to Michigan law.  *See Semtek International Inc. v. Lockheed Martin Corp.,* 531 U.S. 497, 508, 121 S. Ct. 1021, 1028 (2001); *Quality Measurement Co. v. IPSOS S.A.,* No. 01-3208, 56 F. App'x 639, 643 (6th Cir. Jan. 8, 2003). Under Michigan law, a court's decision is entitled to issue-preclusive effect only if, among other requirements, the "identical" issue decided in the earlier action is also presented in the current litigation.  *Amalgamated Transit Union, Local 1564 v. Southeastern Michigan Transportation Authority,* 437 Mich. 441, 473 N.W.2d 249, 254 (1991).  Here, the issues of personal jurisdiction presented in the current and earlier suits are not identical, but instead turn upon almost entirely separate facts and circumstances giving rise to Plaintiff's distinct claims in the two actions. Thus, while the Court found in the earlier suit that Defendant had insufficient contacts with Michigan in the course of his interactions with Plaintiff giving rise to the breach of contract and tort claims asserted in that case, this ruling would not prevent Plaintiff from establishing that Defendant's wholly distinct activities and contacts with Michigan giving rise to the defamation and other claims in ***this*** case are sufficient to warrant this Court's exercise of personal jurisdiction over Defendant.  Simply stated, a court's limited ruling that a party lacked sufficient contacts with the forum state at a specific past point in time does not forever immunize that party from being haled into that forum's courts, nor does it preclude the possibility that the party's ***subsequent*** contacts with the forum state will justify the exercise of personal jurisdiction in a later suit.

Process Clause of the Fourteenth Amendment." *Brink v. Ecologic, Inc.*, 987 F. Supp.

958, 961 (E.D. Mich. 1997) (internal quotation marks and citation omitted); *see also*

*Sifers v. Horen*, 385 Mich. 195, 188 N.W.2d 623, 623-24 (1971).

Accordingly, the Court need not separately consider whether Michigan's long-arm

statute would permit the exercise of personal jurisdiction over Defendant.[5]  Instead, the

Court proceeds directly to the question whether this exercise of personal jurisdiction

would comport with due process.  The Sixth Circuit Court of Appeals has adopted a

three-part test for determining whether this due process standard is met:

> First, the defendant must purposefully avail himself of the privilege of acting in the
> forum state or causing a consequence in the forum state.  Second, the cause of
> action must arise from the defendant's activities there.  Finally, the acts of the
> defendant or consequences must have a substantial enough connection with the
> forum state to make the exercise of jurisdiction over the defendant reasonable.

*LAK, Inc. v. Deer Creek Enters.*, 885 F.2d 1293, 1299 (6th Cir. 1989) (internal quotation

marks and citation omitted).  The Court addresses in turn each of these three elements of

the due process standard.

### 1.    Purposeful Availment

The first, "purposeful availment" element of this due process standard "is satisfied

---

[5]For what it is worth, it seems apparent that the Court would be authorized under the
Michigan statute to exercise personal jurisdiction over Defendant.  A provision of this statute
permits the exercise of limited personal jurisdiction arising from an act which causes
"consequences to occur[] in the state resulting in an action for tort."  Mich. Comp. Laws §
600.705(2).  In this case, Plaintiff has alleged that it suffered consequences to its business
interests in the State of Michigan as a result of Defendant's allegedly defamatory statements.
This suffices to confer limited personal jurisdiction under the Michigan long-arm statute, so long
as the requirements of due process also are satisfied.

when the defendant's contacts with the forum state 'proximately result from actions by the defendant *himself* that create a substantial connection with the forum State,' and when the defendant's conduct and connection with the forum are such that he 'should reasonably anticipate being haled into court there.'" *Compuserve, Inc. v. Patterson*, 89 F.3d 1257, 1263 (6th Cir. 1996) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474-75 (1985)).  This requirement of purposeful availment seeks to ensure that "'random,' 'fortuitous,' or 'attenuated' contacts do not cause a defendant to be haled into a jurisdiction." *Compuserve*, 89 F.3d at 1263 (quoting *Burger King*, 471 U.S. at 475).

For contacts of the sort at issue here — namely, defamatory statements directed at a forum resident — the leading Supreme Court decision on point is *Calder v. Jones,* 465 U.S. 783, 104 S. Ct. 1482 (1984).  In that case, actress Shirley Jones, a California resident, brought suit in a California state court, alleging that she had been defamed in an article published in the National Enquirer and written and edited by petitioners Iain Calder and John South.[6] Although Calder and South were Florida residents who did most of their work on the article in Florida, with the exception of some phone calls to sources in California, the Supreme Court found that the California court had properly exercised personal jurisdiction over the two petitioners:

> The allegedly libelous story concerned the California activities of a

---

[6]The Court noted that the National Enquirer, which was named as a party to Jones's suit along with Calder and South, had "made no objection to the jurisdiction of the California court." *Calder,* 465 U.S. at 785, 104 S. Ct. at 1485.  Rather, the only matter before the Court was the California court's exercise of personal jurisdiction over the two individual defendants, Calder and South.

California resident.  It impugned the professionalism of an entertainer
whose television career was centered in California.  The article was drawn
from California sources, and the brunt of the harm, in terms both of
[Jones's] emotional distress and the injury to her professional reputation,
was suffered in California.  In sum, California is the focal point both of the
story and of the harm suffered.  Jurisdiction over petitioners is therefore
proper in California based on the "effects" of their Florida conduct in
California.

*Calder,* 465 U.S. at 788-89, 104 S. Ct. at 1486-87 (footnote and citations omitted).

In so ruling, the Court rejected the petitioners' contention that they were "not

responsible for the circulation of the article in California," and thus should not be haled

into a California court based on the activities of their employer in which they had "no

direct economic stake" and over which they lacked any control.  465 U.S. at 789, 104 S.

Ct. at 1487.  In support of this argument, the petitioners "liken[ed] themselves to a welder

employed in Florida who works on a boiler which subsequently explodes in California,"

and they pointed to cases holding that personal jurisdiction in these circumstances would

be "proper [only] over the manufacturer," and not the welder.  465 U.S. at 789, 104 S. Ct.

at 1487.  The Court, however, found that this "analogy d[id] not wash":

Whatever the status of the their hypothetical welder, petitioners are not
charged with mere untargeted negligence.  Rather, their intentional, and
allegedly tortious, actions were expressly aimed at California.  Petitioner
South wrote and petitioner Calder edited an article that they knew would
have a potentially devastating impact upon [Jones].  And they knew that the
brunt of that injury would be felt by [Jones] in the State in which she lives
and works and in which the National Enquirer has its largest circulation.
Under the circumstances, petitioners must reasonably anticipate being haled
into court there to answer for the truth of the statements made in their
article.  An individual injured in California need not go to Florida to seek
redress from persons who, though remaining in Florida, knowingly cause
the injury in California.

11

Petitioners are correct that their contacts with California are not to be judged according to their employer's activities there.  On the other hand, their status as employees does not somehow insulate them from jurisdiction. Each defendant's contacts with the forum State must be assessed individually.  In this case, petitioners are primary participants in an alleged wrongdoing intentionally directed at a California resident, and jurisdiction over them is proper on that basis.

465 U.S. at 789-90, 104 S. Ct. at 1487 (internal quotation marks and citations omitted).

*Calder* has been characterized as articulating an "effects test," under which the exercise of personal jurisdiction is proper if the defendant's out-of-state conduct has sufficient "effects" in the forum state, resulting in the "brunt of the harm" being felt there. *Air Products & Controls, Inc. v. Safetech International, Inc.,* 503 F.3d 544, 552 (6th Cir. 2007) (internal quotation marks and citation omitted); *see also Tamburo v. Dworkin,* 601 F.3d 693, 702 (7th Cir. 2010); *Fielding v. Hubert Burda Media, Inc.,* 415 F.3d 419, 425 (5th Cir. 2005).  Yet, the Sixth Circuit has emphasized that it and other appellate courts "have narrowed the application of the *Calder* 'effects test,' such that the mere allegation of intentional tortious conduct which has injured a forum resident does not, by itself, always satisfy the purposeful availment prong."  *Air Products & Controls,* 503 F.3d at 552 (citing cases).   Rather, beyond ascertaining the effects of the defendant's conduct in the forum state, a court must consider the extent to which a defendant has "expressly aimed [his] tortious conduct at the forum."  *Scotts Company,* No. 04-3569, 145 F. App'x 109, 113 n.1 (6th Cir. Aug. 4, 2005); *see also Tamburo,* 601 F.3d at 703 (construing *Calder* as requiring conduct "expressly aimed at the forum state" with the "knowledge that the effects would be felt . . . in the forum state"); *Dudnikov v. Chalk & Vermilion*

12

*Fine Arts, Inc.,* 514 F.3d 1063, 1074-75 (10th Cir. 2008); *Young v. New Haven Advocate,*
315 F.3d 256, 262 (4th Cir. 2002).

In *Reynolds v. International Amateur Athletic Federation,* 23 F.3d 1110, 1120 (6th
Cir. 1994), the Sixth Circuit distinguished *Calder* on this ground, finding that the forum
state of Ohio was not the "focal point" of the allegedly defamatory statement issued by
the defendant.  In that case, a world-class sprinter and Olympic medalist, Harry "Butch"
Reynolds, brought suit in federal district court in Ohio against the International Amateur
Athletic Federation ("IAAF"), an association of national track and field organizations
based in London, England, alleging that the IAAF had defamed him in a press release
stating that a banned substance had been detected in a random drug test of Reynolds
following a track meet in Monte Carlo, Monaco.  The district court found that it could
exercise personal jurisdiction over the IAAF, in light of Reynolds's Ohio residency, the
effects of the IAAF's conduct in Ohio by virtue of Reynolds's lost endorsements and
appearance fees, and the foreseeability that the IAAF's press release would be circulated
and have effects in Ohio.

The Sixth Circuit reversed and held that the IAAF was not amenable to suit in an
Ohio court, explaining that *Calder* was "distinguishable for several reasons":

> First, the press release concerned Reynolds' activities in Monaco, not Ohio.
> Second, the source of the controversial report was the drug sample taken in
> Monaco and the laboratory testing in France.  Third, Reynolds is an
> international athlete whose professional reputation is not centered in Ohio.
> Fourth, the defendant itself did not public or circulate the report in Ohio;
> Ohio periodicals disseminated the report.  Fifth, Ohio was not the "focal
> point" of the press release.  The fact that the IAAF could foresee that the

report would be circulated and have an effect in Ohio is not, in itself, enough to create personal jurisdiction.  Finally, although Reynolds lost Ohio corporate endorsement contracts and appearance fees in Ohio, there is no evidence that the IAAF knew of the contracts or of their Ohio origin.

*Reynolds,* 23 F.3d at 1120.

Cases from other circuits provide further guidance as to the circumstances under which a defendant can be said to have "expressly aimed" his conduct at the forum state by making an allegedly defamatory statement about a forum resident.  In *Fielding, supra,* 415 F.3d at 422-23, the former Swiss ambassador to Germany, Thomas Borer, and his wife, Shawne Fielding, a Texas resident and former winner of Texas beauty pageants, brought suit in a Texas state court against the owners of German-language news magazines, alleging that the magazines had published false and defamatory articles about the couple describing Borer's alleged affair with a European model and containing unflattering characterizations of Fielding.  In holding that personal jurisdiction was lacking over the defendant German media companies, the Fifth Circuit observed that the "clear focus" of the allegedly defamatory articles was the conduct of Borer in Germany and Switzerland, while he served as the Swiss ambassador to Germany.  415 F.3d at 426. Although Texas sources were used to provide a "biographical backdrop" for the articles' discussion of Fielding, the court found that this Texas research had only "marginal importance" to the subject matter of the articles, and that any "references to Texas were merely collateral to the focus of the articles."  415 F.3d at 426-27.  In addition, the court noted that only seventy out of approximately 750,000 weekly issues of the magazines

14

were distributed in Texas, and that the articles were written in German and "directed at a German audience," making it unlikely that the defendants could have foreseen that the articles would have an effect in Texas.  415 F.3d at 426-27.  Thus, even assuming that Fielding suffered some harm in Texas, where she remained a citizen and where many of her family members and friends were located, the court found that the defendants' "conduct and connection with the forum was not such that [they] should have reasonably anticipated being hauled into court there."  415 F.3d at 427 (internal quotation marks, alteration, and citation omitted).

Similarly, in *Young, supra,* 315 F.3d at 258-59, the Fourth Circuit held that a federal district court in Virginia lacked personal jurisdiction over two Connecticut newspapers that had posted articles on the Internet allegedly defaming the warden of a Virginia prison.  In so ruling, the court rejected the plaintiff warden's broad reading of *Calder* as supporting the exercise of personal jurisdiction "simply because the newspapers posted articles on their Internet websites that discussed the warden and his Virginia prison," thereby ensuring that the warden "would feel the effects of any libel in Virginia, where he lives and works."  315 F.3d at 262.  Rather, the court stressed the requirement that the defendant must have "expressly aimed or directed its conduct toward the forum state."  315 F.3d at 262.  The court found that such targeted conduct was lacking in the case before it, where the newspapers' websites featured "decidedly local" content, and where the focus of the articles at issue was a "Connecticut prisoner transfer policy and its impact on the transferred prisoners and their families back home in

15

Connecticut." 315 F.3d at 263. Although the articles "included discussions about the allegedly harsh conditions at the Wallens Ridge prison, where [the plaintiff] was the warden," the court nonetheless concluded that both the newspapers' websites and "the articles in question . . . were aimed at a Connecticut audience," with no evidence of the newspapers' "manifest intent of targeting Virginia readers." 315 F.3d at 263-64; *see also Clemens v. McNamee,* 615 F.3d 374, 380 (5th Cir. 2010) (affirming the ruling of a federal district court in Texas that personal jurisdiction was lacking in a defamation suit brought by pitcher Roger Clemens against his former trainer, Brian McNamee, where McNamee's allegedly defamatory statements "concerned non-Texas activities — the delivery of performance-enhancing drugs to Clemens in New York and Canada"); *Chaiken v. VV Publishing Corp.,* 119 F.3d 1018, 1029 (2d Cir. 1997) (finding that a Massachusetts court lacked personal jurisdiction over an Israeli newspaper that distributed only four copies of its daily publication in Massachusetts, representing only ".004% of its total circulation," and where the article giving rise to the plaintiffs' defamation claim "described only the [plaintiffs'] activities in Israel").

In *Gordy v. Daily News, L.P.,* 95 F.3d 829, 831 (9th Cir. 1996), in contrast, the Ninth Circuit held that a federal district court in California could properly exercise personal jurisdiction over the New York Daily News and one of its columnists in a defamation suit brought by Berry Gordy, the founder of Motown Records and a 24-year California resident. Although the allegedly defamatory Daily News article did not describe any events occurring in California, and although the newspaper distributed only

16

13 copies of its daily edition in California, representing "approximately 0.0017% of the paper's total circulation," the court nonetheless found that the Daily News and its columnist had engaged in activity targeted at "an individual who lives in California," such that it was "reasonable to expect [that] the bulk of the harm from defamation of an individual [would] be felt at his domicile."  95 F.3d at 831, 833.

In so ruling, the Ninth Circuit distinguished cases suggesting that limited distribution of the allegedly defamatory material in the forum state might render the defendant's contacts with the forum too "random, isolated, or fortuitous" to support the exercise of personal jurisdiction.  *Gordy,* 95 F.3d at 833-34 (internal quotation marks and citation omitted) (discussing prior Ninth Circuit rulings).  The court reasoned that "mailing to regular subscribers, even though few, is not random or fortuitous and is not even necessarily isolated."  95 F.3d at 833.  Moreover, the court emphasized that "in deciding how much of any connection is enough, we deal with the entire picture," and it opined that a strict quantitative approach would be "antithetical to *Calder*'s admonishment that the personal jurisdiction inquiry cannot be answered through the application of a mechanical test but instead must focus on the relationship among the defendant, the forum, and the litigation within the particular factual context of each case."  95 F.3d at 834 (internal quotation marks and citation omitted).  The court concluded that this standard for the exercise of personal jurisdiction was met by virtue of the allegedly defamatory article's targeting of a California resident through statements "of a nature that clearly would have a severe impact on Gordy as an individual," and that the limited

17

distribution of these statements in California sufficed to satisfy the dictates of due process. 95 F.3d at 833-34.

Returning to the present case, the facts here do not lie at either end of the range of circumstances addressed in the above-cited case law, but rather fall somewhere in the middle of this spectrum. On one hand, the allegedly defamatory statements made by Dr. Templin about Plaintiff have more than a merely random or fortuitous connection to the forum state of Michigan. The Daily Journal article in question identified Plaintiff as a Michigan-based firm, and it quoted Dr. Templin as accusing Plaintiff of activities that presumably would have been carried out at Plaintiff's principal place of business in Michigan — namely, altering Dr. Templin's report and forging his name on this modified report after he had dictated his findings into Plaintiff's digital recording system. Plaintiff further alleges that it has suffered harm in Michigan as a result of Dr. Templin's allegedly defamatory statements, with a prospective client purportedly citing the Daily Journal article as the reason for its decision to discontinue negotiations on a contract for Plaintiff's services. Finally, the record indicates that at least some subscribers to the Los Angeles Daily Journal are located in Michigan, albeit only three of a total of 6,462 subscribers. (*See* Plaintiff's 3/21/2011 Suppl. Response, Ex. A, Decl. of Los Angeles Daily Journal at ¶ 5.)[7]

---

[7]As noted earlier, the article in question also was published in the San Francisco Daily Journal. However, none of the 3,123 subscribers to the San Francisco Daily Journal is located in Michigan. (*Id.*)

Other considerations, however, cut against this Court's exercise of personal jurisdiction over Dr. Templin.  Dr. Templin's statements comprise only a very small part of a lengthy Daily Journal article discussing practices reportedly employed by insurers throughout the country in handling claims for disability benefits.  Plaintiff certainly is not the principal focus of this article, but is cited as simply one of a number of insurers engaged in practices that the article portrays as widespread in the industry.  Indeed, even in the relatively brief portion of the article addressing Plaintiff and its handling of Terry Hall's claim for disability benefits, Dr. Templin is quoted only twice, and the remaining information in this section of the article evidently is drawn from other sources, such as court records in the earlier suits brought by Mr. Hall against Plaintiff and by Plaintiff against Dr. Templin.

Moreover, Dr. Templin's statements in the Daily Journal article arise from and address only his interactions with Plaintiff in connection with Mr. Hall's claim for benefits.  As this Court observed in the earlier suit brought by Plaintiff against Dr. Templin, this was a "one-time, limited" relationship that Plaintiff initiated by reaching out to a Kentucky physician and soliciting him to perform an IME of a Kentucky resident, and Dr. Templin carried out his obligations "almost exclusively in his home state of Kentucky, with just a handful of mailings and telephone calls to his Michigan business partner." *MLS,* 2008 WL 2704672, at *5-*6.  Since these earlier contacts with Michigan were deemed too attenuated and fortuitous to demonstrate purposeful availment, *see MLS,* 2008 WL 2704672, at *5-*6, it seemingly follows that Dr. Templin's subsequent

19

interview with a Daily Journal reporter recounting these prior interactions with Plaintiff likewise had only a tangential and fortuitous connection to Michigan.

Finally, it cannot be said that either the focus or the subscriber base of the Los Angeles Daily Journal would have alerted Dr. Templin to the likelihood that his statements to a Daily Journal reporter would be published and have effects in Michigan. The target audience of the Daily Journal is the local legal community in and around Los Angeles, California, with this publication featuring articles designed to be of interest to this specific audience of legal professionals.  This local focus is borne out by the evidence indicating that out of the 6,462 subscribers to the Los Angeles Daily Journal, only three (or less than 0.05%) have Michigan addresses.  (*See* Plaintiff's 3/21/2011 Suppl. Response, Ex. A, Decl. of Los Angeles Daily Journal at ¶ 5.)[8]  Moreover, while the Daily Journal posts copies of its articles on its website, this content is available only to subscribers who request a password, and only one of the Daily Journal's three Michigan subscribers requested a password for online access.  (*See id.* at ¶¶ 4-5.)  The editor of the Daily Journal, David Houston, further states that this publication "aggressively polices its content to make sure that anyone who uses it has purchased a license to do so," and that "[n]o one purchased the right to reproduce the story in question."  (*Id.* at ¶ 4.)

Thus, the Daily Journal's "presence" in Michigan is truly *de minimis,* and this publication took no action with respect to the particular article at issue that would have

---

[8]Again, as noted earlier, the article quoting Dr. Templin was also published in the San Francisco Daily Journal, but none of this publication's 3,123 subscribers is located in Michigan.

increased the likelihood that it would be read in Michigan.  Under these circumstances, it

certainly would not have been evident to Dr. Templin that his statements to a Daily

Journal reporter would be disseminated and have an impact in Michigan.  Indeed, as to

the one specific instance of harm identified by Plaintiff as attributable to the Daily Journal

article — a prospective client's termination of negotiations after reading the article —

there is no evidence linking this injury to publication of the article *in Michigan*.  Rather,

Plaintiff has identified this prospective client as a "Washington-based corporation,"

(Plaintiff's Response, Ex. A, Schimizzi Aff. at ¶ 8), and the correspondence through

which this company notified Plaintiff of the termination of the negotiations was sent from

Portland, Oregon, (*see* Plaintiff's Response, Ex. K).  Contrary to Plaintiff's contention,

then, there is no evidence of "wide distribution" of the Daily Journal that would

"substantiate[] the foreseeability," (Plaintiff's Suppl. Response at 2), that Dr. Templin's

statements in a Daily Journal article would be disseminated and produce effects in

Michigan.[9]

　　　Upon considering and weighing the totality of these facts and circumstances, the

Court cannot say that Plaintiff has identified sufficient contacts between Defendant

---

[9]Likewise, to the extent Plaintiff suggests that the foreseeability of an impact in Michigan
is evidenced by the republication of the Daily Journal article on other Internet websites — such
as the "United Policyholders" website run by a non-profit organization that advocates for
insurance consumers, (*see* Plaintiff's Response, Ex. I) — the editor of the Daily Journal states
without contradiction that "[n]o one purchased the right to reproduce the story in question."
(Plaintiff's 3/21/2011 Suppl. Response, Ex. A, Decl. of Los Angeles Daily Journal at ¶ 4.)  Thus,
Plaintiff is mistaken in its assertion that "the Journal granted permission to others to republish
the Article, which has multiplied the Article's exposure to readers across the country."
(Plaintiff's Response at 5.)

Templin and the forum state of Michigan to establish the "purposeful availment" element of the due process standard.  Although Dr. Templin spoke with a Daily Journal reporter about a Michigan-based firm, this establishes only a likelihood that his allegedly defamatory statements would injure a forum resident.  As observed earlier, the satisfaction of this "effects test" does not, by itself, show purposeful availment, but must be accompanied by evidence that the defendant "expressly aimed [his] tortious conduct at the forum." *Air Products & Controls,* 503 F.3d at 552 (internal quotation marks and citation omitted).  In the above-cited cases where this element of "express aiming" was found lacking, the courts relied principally upon (i) the limited dissemination of the allegedly defamatory statement or publication in the forum state, and (ii) the focus of the allegedly defamatory statement or publication on activities occurring outside the forum state.  *See Reynolds,* 23 F.3d at 1120; *Fielding,* 415 F.3d at 426-27; *Young,* 315 F.3d at 263-64; *Chaiken,* 119 F.3d at 1029.  Here, too, the record suggests that the Daily Journal article was distributed only minimally, if at all, in Michigan, and the article did not focus in particular on Plaintiff's (or anyone else's) activities in Michigan, but rather surveyed the practices of insurers located throughout the country.

To be sure, the specific, allegedly defamatory statements made by Dr. Templin were focused on a Michigan firm, and addressed practices presumably carried out by Plaintiff at its principal place of business in Michigan.  The Supreme Court has emphasized that "[e]ach defendant's contacts with the forum State must be assessed individually," *Calder,* 465 U.S. at 790, 104 S. Ct. at 1487, so this Court's exercise of

22

personal jurisdiction over Dr. Templin is not necessarily defeated by the broader focus of the Daily Journal article viewed in its entirety. Yet, as discussed earlier, Dr. Templin's statements concerned his limited, "one-shot" relationship with Plaintiff, *see MLS,* 2008 WL 2704672, at *5, with this physician carrying out his portion of the parties' respective obligations without leaving his home state of Kentucky, and with only minimal (and largely fortuitous and attenuated) contacts with Michigan. Given this Court's prior ruling that this underlying conduct did not rise to the level of purposeful availment, it is difficult to see how merely ***discussing*** this conduct with a California-based reporter could do so. Thus, while the Michigan-related subject matter of Dr. Templin's allegedly defamatory statements makes this a closer case than others where the defamatory statements concerned activities or conduct outside the forum state, *see, e.g., Reynolds,* 23 F.3d at 1120; *Clemens,* 615 F.3d at 380; *Fielding,* 415 F.3d at 426, the Court nonetheless concludes that this limited connection to the forum state, even when combined with the effects felt by a Michigan firm in its home state, is insufficient to establish a *prima facie* showing that Defendant Templin purposefully availed himself of the privilege of conducting activities in Michigan.

Of the above-cited cases, the one that most strongly supports the opposite conclusion is the Ninth Circuit's decision in *Gordy*. Yet, in holding that the defendants in that case had sufficiently aimed their defamatory statements at the forum state of California to warrant the exercise of personal jurisdiction, the court focused almost exclusively on "the fact that Gordy is an individual who lives in California," opining that

23

it was "reasonable to expect the bulk of the harm from defamation of an individual to be felt at his domicile." *Gordy,* 95 F.3d at 833. To the extent that *Gordy* gives controlling weight to a defamatory statement's impact on a resident of the forum state, such exclusive reliance on an "effects test" is contrary to Sixth Circuit precedent, which holds that "the mere allegation of intentional tortious conduct which has injured a forum resident does not, by itself, always satisfy the purposeful availment prong." *Air Products & Controls,* 503 F.3d at 552.

In any event, *Gordy* is distinguishable by its own terms. In that case, the Ninth Circuit discussed (and distinguished) an earlier ruling in which personal jurisdiction was found to be lacking over Swedish writers who allegedly had defamed a California corporation. *See Gordy,* 95 F.3d at 833 (discussing *Core-Vent Corp. v. Nobel Industries AB,* 11 F.3d 1482 (9th Cir. 1993)). *Gordy* viewed this earlier decision as "express[ing] doubt that the defamation was truly targeted at California when the purported target was a corporation that did a worldwide business." *Gordy,* 95 F.3d at 833. Rather, the Ninth Circuit had observed in *Core-Vent* that "[a] corporation does not suffer harm in a particular geographic location in the same sense that an individual does." *Gordy,* 95 F.3d at 833 (quoting *Core-Vent,* 11 F.3d at 1486). The court in *Gordy* thus reasoned that *Core-Vent* was distinguishable, where "Gordy is an individual who lives in California, not a corporation incorporated there and doing business either elsewhere or everywhere." *Gordy,* 95 F.3d at 833.

In this respect, the present case is more like *Core-Vent* than *Gordy*. Plaintiff here

24

is a Michigan corporation, not an individual.  It has stated in its submissions to the Court that it "transacts business . . . across the country and its customer base is national in scope."  (Plaintiff's Response Br. at 2.)  Indeed, Plaintiff's one example of injury brought about by Dr. Templin's allegedly defamatory statements is the termination of contract negotiations by a prospective client based in Washington.  Accordingly, even if the Court viewed *Gordy* as persuasive and consistent with Sixth Circuit precedent, it seemingly indicates that less weight should be given to the effects of a defamatory statement on a forum resident where, as here, the forum resident is a corporation rather than an individual.

In sum, having carefully considered the facts of this case in light of the pertinent case law, the Court holds that the "purposeful availment" prong of the due process standard has not been met.  Although Dr. Templin's defamatory statements concerned the activities of a Michigan corporation, and although at least some of these activities were carried out in Michigan, the Court concludes that these limited instances of conduct aimed at Michigan are substantially outweighed by other considerations that preclude a finding of purposeful availment.  Most significantly, Dr. Templin made his statements to a reporter for a California publication that is targeted at California legal practitioners and has virtually no circulation in Michigan, thereby substantially diminishing the likelihood and foreseeability that these statements would be disseminated and have effects in Michigan.  The article in which Dr. Templin's statements appeared addressed the practices of insurers located throughout the country, with no particular or significant

25

focus on Plaintiff or activities occurring in the forum state of Michigan.  Finally, Dr.

Templin's statements concerned an underlying one-shot transaction with Plaintiff that did

not require him to leave his home state of Kentucky or engage in significant or ongoing

contacts with the State of Michigan.  For all of these reasons, then, the Court finds that

Plaintiff has failed to make a *prima facie* showing that Defendant Templin purposefully

availed himself of the privilege of conducting activities in Michigan.

### 2.       Forum-Related Activities

In light of the Court's determination that the first, "purposeful availment" prong of

the due process standard has not been satisfied in this case, the remaining two elements of

this standard may be addressed only briefly.  *See Kerry Steel, Inc. v. Paragon Industries,*

*Inc.,* 106 F.3d 147, 150 (6th Cir. 1997) (observing that purposeful availment is the "*sine*

*qua non*" of a court's due process inquiry, and that "Supreme Court decisions have

reinforced the centrality of this factor" (internal quotation marks and citations omitted)).

Under the second prong of the due process standard, the Court must consider whether the

current controversy arises from Defendant Templin's forum-related activities.  This

element is satisfied so long as the operative facts of the controversy are related to Dr.

Templin's contacts with the state.  *See  Southern Machine Co. v. Mohasco Industries,*

*Inc.*, 401 F.2d 374, 384 & n.29 (6th Cir. 1968).

Plaintiff has made a *prima facie* showing of such a relationship here.  Plaintiff's

claims against Dr. Templin in this case arise from allegedly defamatory statements made

by Dr. Templin to a Daily Journal reporter concerning Plaintiff's alleged forgery of the

doctor's name on an IME report in which Dr. Templin's original findings purportedly had been altered. As discussed above, Dr. Templin's statements qualify as contacts with the State of Michigan, where he commented on a Michigan corporation and described activities that were at least partly carried out by Plaintiff in Michigan, following the doctor's dictation of his findings into Plaintiff's in-house digital recording system. Because these Michigan contacts, though limited, bear a sufficient relationship to the facts giving rise to Plaintiff's claims, the Court finds that the second prong of the due process inquiry is satisfied.

### 3. Reasonableness of Exercise of Jurisdiction

As the third and final element of its due process inquiry, the Court must consider whether Defendant Templin's actions, or the consequences brought about by these actions, have a substantial enough connection with Michigan to make the exercise of jurisdiction over Defendant reasonable. The courts look at several factors when assessing the reasonableness of the exercise of jurisdiction, including "the burden on the defendant, the interest of the forum state, the plaintiff's interest in obtaining relief, and the interest of other states in securing the most efficient resolution of controversies." *Compuserve,* 89 F.3d at 1268 (internal quotation marks and citations omitted).

The Court finds that the exercise of jurisdiction here would be unreasonable. First, Dr. Templin would be burdened by this exercise of jurisdiction, as he would be required to bear the expense and inconvenience of traveling to Michigan and paying local counsel. Next, while the State of Michigan undoubtedly has an interest in protecting the rights and

27

interests of businesses incorporated in this state, this interest is somewhat diminished under the particular facts and circumstances of this case.  In particular, while Dr. Templin reached out beyond the borders of his home state of Kentucky to make his allegedly defamatory statements about Plaintiff, he did so through an interview with a reporter for a California publication that serves the California legal community and has virtually no circulation in Michigan, and his statements appeared in an article that discussed litigation and insurer practices throughout the country and was not focused to any significant extent on Michigan-based activities or occurrences.  Moreover, the harm allegedly suffered by Plaintiff was not purely local in nature, but instead affected business interests that were national in scope.  Finally, Michigan's interest in vindicating the rights of a Michigan business is offset by Kentucky's interest in safeguarding the rights of a Kentucky resident, Dr. Templin, and in ensuring that claims against a Kentucky resident are litigated in an efficient and cost-effective manner.

On balance, then, the Court finds that the exercise of jurisdiction over Defendant Templin would not be reasonable in this case.  Because Plaintiff has failed to make a *prima facie* showing as to this or the "purposeful availment" prongs of the due process inquiry, the Court finds that this case must be dismissed for lack of personal jurisdiction.

28

## IV.  <u>CONCLUSION</u>

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant's February 3,

2011 motion to dismiss (docket #7) is GRANTED.


<u>s/Gerald E. Rosen</u>
Chief Judge, United States District Court

Dated:  May 16, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record
on May 16, 2011, by electronic and/or ordinary mail.

<u>s/Ruth A. Gunther</u>
Case Manager